Nos. 26-1736, 26-1787

# In the United States Court of Appeals for the Sixth Circuit

SACRED HEART OF JESUS PARISH, et al.,

*Plaintiffs-Appellants/ Cross-Appellees,*

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan,

*Defendant-Appellee/ Cross-Appellant,*

JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Michigan
(1:22-cv-1214) (Beckering, J.)

**BRIEF OF BRIGHAM YOUNG UNIVERSITY; FRANCISCAN UNIVERSITY OF STEUBENVILLE; LIBERTY UNIVERSITY; BRIGHAM YOUNG UNIVERSITY–IDAHO; COLORADO CHRISTIAN UNIVERSITY; REGENT UNIVERSITY; ENSIGN COLLEGE; THE CATHOLIC UNIVERSITY OF AMERICA; HOUSTON CHRISTIAN UNIVERSITY; HARDING UNIVERSITY; OKLAHOMA CHRISTIAN UNIVERSITY; BRIGHAM YOUNG UNIVERSITY–HAWAII; AVE MARIA UNIVERSITY; URSHAN UNIVERSITY; DIVINE MERCY UNIVERSITY; JOHN PAUL THE GREAT CATHOLIC UNIVERSITY; AND WYOMING CATHOLIC COLLEGE AS *AMICI CURIAE* SUPPORTING APPELLANTS/CROSS-APPELLEES SACRED HEART OF JESUS PARISH, ET AL. AND REVERSAL**


Steve Sandberg
David Andersen
Aaron Worthen
Brigham Young University
Office of General Counsel
109 MCDB
Provo, UT 84602
(801) 422-4636

Christopher A. Bates
Alan Hurst
Kristen Clarke
Kirton | McConkie
36 South State Street, Suite 1900
Salt Lake City, UT 84111
(801) 328-3600

*Counsel for Amici Curiae*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Sixth Circuit Case Numbers: 26-1736, 26-1787

Case Name: *Sacred Heart of Jesus Parish v. Nessel*

Name of Counsel: Christopher A. Bates

Pursuant to 6th Cir. R. 26.1,

> *Amici curiae* Brigham Young University; Franciscan University of Steubenville; Liberty University; Brigham Young University–Idaho; Colorado Christian University; Regent University; Ensign College; The Catholic University of America; Houston Christian University; Harding University; Oklahoma Christian University; Brigham Young University–Hawaii; Ave Maria University; Urshan University; Divine Mercy University; John Paul the Great Catholic University; and Wyoming Catholic College

make the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party: **NO**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest: **NO**

*/s/ Christopher A. Bates* October 30, 2026

Christopher A. Bates
*Counsel for Amici Curiae*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .................................................................. iii

INTERESTS OF *AMICI CURIAE* .......................................................... 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ...................................................................................... 5

I. The Church Autonomy Doctrine Protects the Right of Religious Colleges and Universities to Exercise Their Religion by Filling Non-Ministerial Positions with Those Who Adhere to the School's Faith ................................................................................ 5

A. The First Amendment Protects the Freedom of Religious Schools to Choose Employees Who Will Effectively Advance Their Religious Missions .................................................................. 5

B. Many Religious Schools Rely on Non-Ministerial Employees to Advance Their Religious Missions ................................................. 8

C. Deciding Whom to Employ in Non-Ministerial Positions Is an Internal Decision Reflecting the School's Faith and Religious Mission ........................................................................ 12

D. Religious Educational Institutions Define Themselves by Employing People Committed to the Institution's Religious Mission ........................................................................ 15

1. Some Religious Schools Require Compliance with a Faith-Based Code of Conduct ............................................................ 16

2. Some Religious Schools Require Affirmations of Faith ........... 20

3. Some Religious Schools Require or Encourage Formal Affiliation with a Particular Religious Organization .............. 22

II. Michigan Law Is Neither Neutral nor Generally Applicable and Cannot Satisfy Strict Scrutiny as Applied to Sacred Heart ............. 24

A. The ELCRA Is Neither Neutral nor Generally Applicable and Therefore Must Meet Strict Scrutiny under *Fulton* ..................... 24

B. The ELCRA Violates *Tandon*'s Most-Favored-Nation Principle ..................... 32

C. Michigan Cannot Satisfy Strict Scrutiny as Applied to Sacred Heart ..................... 34

CONCLUSION ..................... 36

## TABLE OF AUTHORITIES

### CASES

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .......... 26

*Bowen v. Kendrick*,
487 U.S. 589 (1988) .......... 12

*Christian Healthcare Ctrs., Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) .......... 29

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .......... 24, 25

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*,
483 U.S. 327 (1987) .......... 6, 7, 9

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 4, 24, 25, 27, 29, 32, 33, 34, 35

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) .......... 34

*Hall v. Baptist Mem'l Health Care Corp.*,
215 F.3d 618 (6th Cir. 2000) .......... 10

*Hill v. Colorado*,
530 U.S. 703 (2000) .......... 36

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) .......... 6, 8, 12, 13, 29

*MoChridhe v. Acad. of Holy Angels*,
29 N.W.3d 753 (Minn. Ct. App. 2025) .......... 10

*NLRB v. Cath. Bishop of Chi.*,
440 U.S. 490 (1979) .......... 15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) .................................................... 5, 6, 7, 8, 9, 13, 27

*Pulsifer v. Westshore Christian Acad.*,
142 F.4th 859 (6th Cir. 2025) .................................................................. 6

*Rouch World, LLC v. Dep't of C.R.*,
987 N.W.2d 501 (Mich. 2022) ........................................................ 26, 30

*Sacred Heart of Jesus Parish v. Nessel*,
No. 1:22-cv-1214, 2026 WL 2546217 (W.D. Mich. Aug. 5, 2026) ........... 3

*Seattle's Union Gospel Mission v. Woods*,
142 S. Ct. 1094 (2022) ............................................................................ 13

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
41 F.4th 931 (7th Cir. 2022) ..................................................................... 6

*Tandon v. Newsom*,
593 U.S. 61 (2021) ............................................................... 4, 32, 33, 36

*Watson v. Jones*,
80 U.S. (13 Wall.) 679 (1872) ................................................................ 29

## STATUTES

MICH. COMP. LAWS § 37.2202 ................................................. 25, 29, 30, 33

MICH. COMP. LAWS § 37.2208 ................................................... 2, 26, 27, 28

MICH. COMP. LAWS § 37.2301 ........................................................................ 30

MICH. COMP. LAWS § 37.2302 ................................................................ 29, 30

Mich. Comp. Laws § 37.2402 ........................................................................ 29

Mich. Comp. Laws § 37.2403 ................................................................ 29, 30

Mich. Comp. Laws § 37.2404 ........................................................................ 30

**OTHER AUTHORITIES**

Athanasius G. Sirilla, *The "Nonministerial" Exception*, 99 NOTRE DAME L. REV. 393 (2023) .......... 9

BEULAH HEIGHTS UNIV., *Soul of Beulah* .......... 22

BRIGHAM YOUNG UNIV., *Aims of a BYU Education* .......... 17

BRIGHAM YOUNG UNIV., *BYU Mission Statement* (Nov. 4, 1981) .......... 17

BRIGHAM YOUNG UNIV., *Church Educational System Honor Code* .......... 17

BRIGHAM YOUNG UNIV., *Ecclesiastical Conditions of Employment and University Standards Policy* .......... 17, 18

BRIGHAM YOUNG UNIV., *Ecclesiastical Endorsements and Resources* .......... 18

C. Shane Reese, *Becoming BYU: An Inaugural Response*, BYU: SPEECHES (Sep. 19, 2023) .......... 11

CEDARVILLE UNIV., *Faculty and Staff Community Covenant* .......... 21

Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373 (1981) .......... 8, 9

FORDHAM UNIV., *Mission Statement.* .......... 23

FORDHAM UNIV., *Recruitment of Jesuits to the Faculty* .......... 23

FRESNO PAC. UNIV., FAITH REQUIREMENTS FOR EMPLOYMENT (2024) .......... 21

GEORGE FOX UNIV., *Employee Handbook: Statement of Faith* .......... 21

GEORGE M. MARSDEN, THE SOUL OF THE AMERICAN UNIVERSITY REVISITED (2021) .......... 15, 16

Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad as It Needs to Be?*, 25 TEX. REV. L. & POL. 319 (2021) .......... 13, 14

Kathleen A. Brady, *Religious Organizations and Free Exercise: The Surprising Lessons of Smith*, 2004 BYU L. REV. 1633 ................ 12

OAKWOOD UNIV., *Mission and History* .................................................. 19

OAKWOOD UNIV., *Our Beliefs* ............................................................. 20

OAKWOOD UNIV., FACULTY HANDBOOK (2008) ....................................... 20

OAKWOOD UNIV., FALL 2024 ENROLLMENT STATISTICS (2024) ................. 19

OLIVET NAZARENE UNIV., EMPLOYEE STATEMENT OF MISSION, FAITH, AND LIFESTYLE COVENANT (2023). ........................................................ 22

POINT UNIV., STATEMENT OF FAITH (2025)............................................... 22

R. Shawn Gunnarson, James C. Phillips & Christopher A. Bates, *Religious Employment and the Tensions Between Liberty and Equality*, 51 BYU L. REV. 279 (2025) .................................................. 15

REGENT UNIV., *New Faculty* ................................................................. 21

REGENT UNIV., *Vision and Mission: Statement of Faith* ........................ 21

Elder Ronald A. Rasband, *Recommended to the Lord*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS (Oct. 3, 2020) ............................ 18

S. WESLEYAN UNIV., *Doctrinal Statement* .............................................. 21

*Seattle Pacific Files Lawsuit in Support of Religious Freedom*, SEATTLE PAC. UNIV., (July 28, 2022) .................................................. 11

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *General Handbook: Serving in The Church of Jesus Christ of Latter-day Saints* § 26.4 ........................................................................... 18, 19

UNIV. OF S.F., COLLECTIVE BARGAINING AGREEMENT (2016) .................. 23

UNIV. OF S.F., *Mission Statement* ........................................................... 23

WHEATON COLL., *Statement of Faith and Educational Purpose*............21

YESHIVA UNIV., EMPLOYEE HANDBOOK (2022).........................................11

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are 17 religious colleges and universities with over 277,000 total students. *Amici* hold different religious beliefs but are united in their commitment to defending the religious freedom of churches, religious schools, and other faith-based organizations. Religious freedom for all Americans will be seriously harmed unless this Court affirms the right of religious employers to choose employees whose conduct and beliefs are in harmony with the employers' religion.

## SUMMARY OF ARGUMENT

Religious schools exercise their religion through their employment decisions. The freedom to form a workplace united around a common faith is indispensable to a religious institution's identity.

Michigan law threatens that freedom. The Elliott-Larsen Civil Rights Act (ELCRA) lacks any exemption for religious employers from the statute's broad proscription against employment discrimination. And although the statute creates a procedure under which employers

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici*, their members, and their counsel, made any monetary contribution toward the preparation or submission of this brief.

may seek exemptions on a case-by-case basis for "bona fide occupational qualification[s] [BFOQs] reasonably necessary to the normal operation of the business or enterprise," MICH. COMP. LAWS § 37.2208, when it comes to religious schools, Michigan has consistently limited such exemptions to teaching and policymaking positions. Support staff, clerical or maintenance personnel, facilities supervisors, and other non-ministerial employees all have been found not to qualify. *See* Pls.' Mot. for Summ. J., App. pt. 1, R. 88-2, Page ID # 2367–68; *id.* pt. 3, R. 88-4, Page ID # 2608. There also is no guarantee that a BFOQ exemption will be granted for any given position, as such exemptions are discretionary. *See* MICH. COMP. LAWS § 37.2208.

The upshot is that in practice, Michigan law leaves religious schools vulnerable to discrimination suits when they limit employment to those who align with the school's faith. That result violates the autonomy of religious institutions to exercise their religion through their employment choices.

Concerned about these risks, Sacred Heart of Jesus Parish ("Sacred Heart") sought injunctive and declaratory relief against applications of the ELCRA that would limit its ability to select

employees who share its faith. Sacred Heart requires all employees—including those who do not preach, teach, or perform other ministerial functions—to be practicing Catholics who follow the religion's teachings.

The district court acknowledged that the First Amendment protects a religious employer's right to limit ministerial employment to individuals who share the employer's faith. *Sacred Heart of Jesus Parish v. Nessel*, No. 1:22-cv-1214, 2026 WL 2546217, at *10–12 (W.D. Mich. Aug. 5, 2026). But the lower court found no First Amendment violation when a state prohibits religious employers from similarly limiting non-ministerial employment to those who adhere to the employer's religion. *Id.* at *11–12. According to the district court, government can tell religious employers that they must be willing to hire people from other faiths, or no faith at all, for every non-ministerial position. *See id.* at *12.

The First Amendment, however, is not so limited. Religious organizations, including religious schools like *amici*, must have the autonomy to employ both ministerial and non-ministerial co-religionists to advance their religious missions. Choosing to employ

those who share common religious beliefs and standards of personal conduct reflects a religious organization's faith and values. Hiring only co-religionists also sends the message that the organization exists to pursue a distinct religious mission and to inculcate its religion in all of its employees and other community members. Because the district court misconceived the scope of First Amendment protections available to religious employers, this Court should reverse.

Reversal is also required because the ELCRA cannot satisfy strict scrutiny. *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), and other cases require strict scrutiny when a law is not neutral toward religion or generally applicable. A parallel rule applies under *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam). That rule holds that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id.* at 62.

Both rules apply here. Because the ELCRA contains a system for granting individualized exemptions, and because it contains numerous statutory exceptions that undermine the government's

asserted interests in eradicating discrimination, the statute is neither neutral toward religion nor generally applicable. It also treats comparable secular activities more favorably than religious exercise. Strict scrutiny therefore applies—a demanding standard Michigan does not satisfy.

## ARGUMENT

### I. The Church Autonomy Doctrine Protects the Right of Religious Colleges and Universities to Exercise Their Religion by Filling Non-Ministerial Positions with Those Who Adhere to the School's Faith.

#### A. The First Amendment Protects the Freedom of Religious Schools to Choose Employees Who Will Effectively Advance Their Religious Missions.

The First Amendment secures the right of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020). This principle, known as the church autonomy doctrine, guarantees religious entities "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* at 746. It includes a religious entity's right to hire only persons of its own faith or those fully committed to its religious mission, even for non-ministerial positions.

Behind the church autonomy doctrine lies "the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring in the judgment). That is because for many people, religion is not solely a matter of individual faith and belief, but rather "derives meaning in large measure from participation in a larger religious community." *Id.*

Religious schools possess the same constitutionally protected autonomy. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe*, 591 U.S. 732. Various circuit decisions affirm that the church autonomy doctrine applies with full force to religious schools. *See, e.g.*, *Pulsifer v. Westshore Christian Acad.*, 142 F.4th 859, 864–66 (6th Cir. 2025); *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 942–45 (7th Cir. 2022).

A component of the church autonomy doctrine is the "ministerial exception." *See Hosanna-Tabor*, 565 U.S. at 188; *Our Lady of Guadalupe*, 591 U.S. at 746–47. That exception requires courts to "stay out of

employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 591 U.S. at 746. The ministerial exception protects the right of religious schools to choose "ministerial" employees—those "entrusted with the responsibility of 'transmitting the … faith'" to students—free from state interference. *Id.* at 754.

But the church autonomy doctrine is not limited to the ministerial exception. *See id.* at 747 (recognizing that none of the Court's prior church autonomy cases "was exclusively concerned with the selection or supervision of clergy"). One of the "internal management decisions that [is] essential to [a religious] institution's central mission" is the selection of employees crucial to performing its religious mission. *Id.* at 746. "Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them," is an important "means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J.,

concurring in the judgment). Those principles apply to ministerial and non-ministerial employees alike.[2]

### B. Many Religious Schools Rely on Non-Ministerial Employees to Advance Their Religious Missions.

Like all religious employers, religious schools rely on both ministerial and non-ministerial employees to advance their religious missions. "Such institutions can only be run through employees." Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1408 (1981). Employees at religious schools teach courses, conduct research, administer finances, govern admissions, manage housing, serve food, maintain physical property, manage communications and information technology, deliver health services,

[2] The ministerial exception provides complete protection to religious organizations from *all* employment claims involving ministerial employees. *See Hosanna-Tabor*, 565 U.S. at 188; *Our Lady of Guadalupe*, 591 U.S. at 747. This case, by contrast, involves a different issue: whether the church autonomy doctrine protects the ability of religious organizations to engage in a specific type of discrimination—limiting employment (including in non-ministerial positions) to individuals who adhere to the organization's faith and doctrine. The ministerial exception thus does important work separate and apart from the issue in this case, as it is not limited to a specific type of discrimination, but rather encompasses all employment discrimination claims by ministerial employees, whatever their basis.

organize student activities, and perform numerous other tasks that are necessary for the school to function. Religious schools "rely on employees to do the work of" the school "and to do it in accord with church teaching." *Id.* at 1409. Employees, in turn, "accept[] responsibility to carry out part of the [school's] religious mission" in their area of assigned duties. *Id.* at 1408.

A religious school's ministerial employees—including those specifically tasked with teaching and overseeing matters of faith—are unquestionably essential to its religious mission. But for many schools, so are employees who perform non-ministerial duties. Those employees "play a vital role" in the school's work as well. Athanasius G. Sirilla, *The "Nonministerial" Exception*, 99 NOTRE DAME L. REV. 393, 410 (2023). Activities that might otherwise appear secular are frequently "infused with a religious purpose" because they contribute to the school's overriding religious mission. *Amos*, 483 U.S. at 344 (Brennan, J., concurring in the judgment).

Consider a few examples.[3] A librarian does not teach courses or interact with students beyond helping with the checkout and return of books. But by choosing materials for the catalog and assisting with research and other library operations, the librarian unquestionably "support[s] the mission of" the school to educate students in the faith. *MoChridhe v. Acad. of Holy Angels*, 29 N.W.3d 753, 762 (Minn. Ct. App. 2025), *review granted*, No. A25-0559, 2026 WL 681036 (Minn. Feb. 25, 2026).

A "student services specialist" at a religious medical college helps student organizations organize and plan activities but has no direct duties to witness directly to students or share spiritual insights. *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 622 (6th Cir. 2000). Still, that specialist advances the college's religious mission by facilitating student engagement in the campus community, "interpreting school policies," and "ensuring that all student activities [a]re consistent with the [school's] mission" of "preaching, teaching, and healing." *Id.*

---

[3] *Amici* do not suggest that the jobs described in these examples could never qualify as ministerial positions. These examples show, instead, that jobs lacking some of the traditional hallmarks of a ministerial position can still contribute to a school's religious mission.

Many religious schools—including *amici*—affirm the importance of *all* employees to the school's religious mission. At his inauguration in 2023, for example, Brigham Young University President Shane Reese described both faculty and staff as "consecrated colleagues … who labor tirelessly to make our inspired mission a reality for our students."[4] The president of Seattle Pacific University similarly characterized the "faith commitment" of both faculty and staff as "an essential foundation [of its] identity as a Christian University."[5] And Rabbi Dr. Ari Berman, president of Yeshiva University, tells all employees that they are "essential" to the school's religious mission to provide an education "rooted in Jewish thought and tradition."[6]

Because inculcating the faith is a collective effort that spreads across all aspects of campus life, even employees whose duties lack

---

[4] C. Shane Reese, *Becoming BYU: An Inaugural Response*, BYU: SPEECHES (Sep. 19, 2023), https://speeches.byu.edu/talks/c-shane-reese/becoming-byu-an-inaugural-response.

[5] *Seattle Pacific Files Lawsuit in Support of Religious Freedom*, SEATTLE PAC. UNIV., (July 28, 2022), https://spu.edu/about-spu/press-room/Press/ag-lawsuit.

[6] YESHIVA UNIV., EMPLOYEE HANDBOOK 1 (2022), https://www.yu.edu/sites/default/files/inline-files/YU_Employee%20Handbook_AC_March%202022.pdf.

"explicitly religious content" or whose duties are not expressly "designed to inculcate [religious] views," *Bowen v. Kendrick*, 487 U.S. 589, 621 (1988), contribute to a school's religious mission.

### C. Deciding Whom to Employ in Non-Ministerial Positions Is an Internal Decision Reflecting the School's Faith and Religious Mission.

Religious organizations, including religious schools, "put their beliefs into action [through] shaping organizational structure, developing rules for church discipline, [and] clarifying the rights and duties of members and employees." Kathleen A. Brady, *Religious Organizations and Free Exercise: The Surprising Lessons of Smith*, 2004 BYU L. REV. 1633, 1676. Their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring).

Hiring decisions reflect those religious ideals. Through such decisions, a religious school identifies and selects for the qualities it believes are most important in those who assist the school in carrying out its mission. Traits like dependability, proficiency, and relevant work experience matter. But that is not all. Equally important to many such schools is a shared commitment to the school's religious doctrine and

beliefs. "This locates the matter of many of their appointments within the realm of religious decisions about faith, doctrine, and religious mission." Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad as It Needs to Be?*, 25 TEX. REV. L. & POL. 319, 333 (2021).

All this is true of "ministerial" employees "entrusted with the responsibility of transmitting the … faith." *Our Lady of Guadalupe*, 591 U.S. at 754 (citation modified). But it likewise is true of non-ministerial employees. A non-ministerial employee may not be tasked with overtly "transmitting … the faith" the same way a pastor or instructor might be, but a religious school still must have the autonomy to decide that the employee should "personify" the religious institution's "beliefs." *Hosanna-Tabor*, 565 U.S. at 188, 192. How employees conduct themselves on and off the job reflects an organization's values and expectations. "To force [a religious school] to hire … personnel who do not share [its] religious views would undermine not only [its] autonomy," but "also [its] continued viability." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari).

Non-ministerial employees at religious schools help to shape and communicate the school's religious message. "Admissions officers speaking about a school's priorities to incoming parents and students help both to shape the future religious tone of the school and to communicate about the school's commitment to its religious beliefs." Alvaré, 25 TEX. REV. L. & POL. at 331. Communications staff "help articulate or even shape an institution's public persona." *Id.* "Finance officers charged to invest in line with a religion's beliefs will communicate those beliefs to donors, employees, and the wider world." *Id.* at 331–32. Coaches and other extracurricular activity leaders "exemplify the meaning of sport [and other activities] within a religious framework and may also be important role models of faith in a student's life." *Id.* at 331.[7]

Requiring *all* employees—groundskeepers, bookkeepers, and IT specialists, not just those in public-facing ministerial roles—to follow religious conduct standards reflects the importance of the underlying religious beliefs and doctrines. After all, a religious school does not only aim to educate students for success in the marketplace. Its "*raison d'être*"

[7] Many coaches and extracurricular activity leaders likely qualify as ministerial employees, particularly at schools that expect all activity leaders to play a role in transmitting the faith.

is no less than "the propagation of a religious faith." *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 503 (1979) (citation modified). Forming a community bound by common religious standards is a matter of institutional identity for a religious school—and a vital means of unifying its students and employees around its religious mission. A religious institution's freedom to align all employment decisions with a common faith is fundamental to that mission. *See* R. Shawn Gunnarson, James C. Phillips & Christopher A. Bates, *Religious Employment and the Tensions Between Liberty and Equality*, 51 BYU L. REV. 279, 312–13 (2025).

### D. Religious Educational Institutions Define Themselves by Employing People Committed to the Institution's Religious Mission.

Religious colleges and universities were present in America long before our nation's Founding. Education was originally a religious enterprise. Harvard was founded to train clergy; Yale was founded to train more orthodox clergy amid concerns that Harvard had strayed from the faith. GEORGE M. MARSDEN, THE SOUL OF THE AMERICAN UNIVERSITY REVISITED 38, 45–47 (2021).

Because they considered education a religious project, these schools required their teachers to share their religious beliefs. In its early

decades, Harvard lacked a "formal theological test for those who taught at the college," but "that was only because such a test did not need to be stated." *Id.* at 37. When one of Harvard's early presidents "questioned the practice of infant baptism, there was no choice but for him to resign." *Id.* Only twenty years after its founding, Yale dismissed its rector when he announced his conversion to Anglicanism. *Id.* at 46.

Harvard, Yale, and other schools have since ended their religious affiliations, yet America's religiously affiliated schools have grown dramatically in number and diversity. Today, many religious schools from many faith traditions seek to preserve their religious character through religiously inspired codes of conduct, mandatory statements of faith, or other religiously motivated hiring requirements or preferences.

#### 1. Some Religious Schools Require Compliance with a Faith-Based Code of Conduct.

Brigham Young University (BYU), established and guided by The Church of Jesus Christ of Latter-day Saints, is the flagship institution of the Church Educational System (CES). "[T]he common purpose of all education at BYU" is to build faith in "the restored gospel of Jesus

Christ."[8] BYU and other CES institutions seek to "develop disciples of Jesus Christ who are leaders in their homes, the Church, and their communities."[9] "To succeed in this mission the university must provide an environment enlightened by living prophets and sustained by those moral virtues which characterize the life and teachings of the Son of God."[10]

"To best accomplish this purpose," BYU and other CES schools "select[] and retain[] employees who are committed to and represent the teachings, practices, and doctrine of the Church of Jesus Christ."[11] This includes a commitment to act in accordance with a religiously inspired Honor Code.[12] Also, employees who are members of the Church of Jesus

---

[8] BRIGHAM YOUNG UNIV., *Aims of a BYU Education*, https://aims.byu.edu/aims-of-a-byu-education (last visited Oct. 27, 2026).

[9] BRIGHAM YOUNG UNIV., *Ecclesiastical Conditions of Employment and University Standards Policy*, https://policy.byu.edu/view/ecclesiastical-conditions-of-employment-and-university-standards-policy (last visited Oct. 27, 2026).

[10] BRIGHAM YOUNG UNIV., *BYU Mission Statement* (Nov. 4, 1981), https://aims.byu.edu/byu-mission-statement.

[11] BRIGHAM YOUNG UNIV., *Ecclesiastical Conditions of Employment*.

[12] BRIGHAM YOUNG UNIV., *Church Educational System Honor Code*, https://policy.byu.edu/view/church-educational-system-honor-code (last visited Oct. 27, 2026).

Christ must obtain an ecclesiastical endorsement[13] and, when applying for employment, must "accept as conditions of employment that they will hold and be worthy to hold a current temple recommend."[14]

A temple recommend is a certificate provided to members who attest to local Church leaders that they affirm the Church's beliefs and observe specific conduct standards of the Church.[15] It "reflects a deep, spiritual intent" that the member is "striving to live the laws of the Lord" and is "commit[ted] … to those standards."[16] These combined conduct standards include, among other things, abstaining from illegal drugs, alcohol, tobacco, marijuana, vaping, tea, and coffee; abstaining from

---

[13] BRIGHAM YOUNG UNIV., *Ecclesiastical Endorsements and Resources*, https://honorcode.byu.edu/ecclesiastical-endorsements-and-resources (last visited Oct. 27, 2026).

[14] BRIGHAM YOUNG UNIV., *Ecclesiastical Conditions of Employment*.

[15] *See* THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *General Handbook: Serving in The Church of Jesus Christ of Latter-day Saints* § 26.4.

[16] Elder Ronald A. Rasband, *Recommended to the Lord*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS (Oct. 3, 2020), https://www.churchofjesuschrist.org/study/general-conference/2020/10/16rasband?lang=eng.

sexual relations outside marriage between a man and a woman; paying tithing; and being modest, neat, and clean in dress and grooming.[17]

BYU and the other CES schools are not alone. Oakwood University, in Huntsville, Alabama, serves similar purposes for a different religious group. "[A] historically black, Seventh-day Adventist institution," Oakwood was founded in 1896 on the land of a "former slave plantation" in order "to educate the recently-freed African-Americans of the South."[18] Today, Oakwood serves about 1,200 students, whom it aims "to transform … through biblically-based education for service to God and humanity."[19]

Like BYU, Oakwood reinforces its religious character through a code of conduct. According to its faculty handbook, "full-time members of the faculty … must, in general, be members in good and regular standing

---

[17] THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *General Handbook* § 26.4.1.

[18] OAKWOOD UNIV., *Mission and History*, https://oakwood.edu/our-story/mission-history (last visited Oct. 27, 2026).

[19] *Id.*; *see also* OAKWOOD UNIV., FALL 2024 ENROLLMENT STATISTICS (2024), https://oakwood.edu/wp-content/uploads/Fall-Semester-2024-Enrollment-Statistics.pdf.

of the Seventh-day Adventist Church."[20] "Every faculty member has, by reason of his/her acceptance of employment, an obligation to conduct his/her personal and professional life in harmony with the teachings of the Church."[21] Even tenured faculty may be terminated "for inexcusable or persistent defiance and opposition to the standards and teachings of the Seventh-day Adventist Church as set forth in the 'Statement of Fundamental Beliefs.'"[22]

### 2. Some Religious Schools Require Affirmations of Faith.

Many religious schools secure their religious character by requiring formal statements of faith. Regent University, for example, requires all prospective employees to certify their belief in the Holy Trinity, the Virgin Birth of Jesus, the infallibility of the Bible, and that "Christ will personally return to earth in power and glory."[23] Wheaton College

---

[20] OAKWOOD UNIV., FACULTY HANDBOOK 15 (2008), https://www.oakwood.edu/zPublic/human-resources/accordion/Handbooks/Full-time-Faculty-Handbook.pdf.

[21] *Id.*

[22] *Id.* at 40; *see* OAKWOOD UNIV., *Our Beliefs*, https://oakwoodsda.com/about/our-beliefs (last visited Oct. 27, 2026).

[23] REGENT UNIV., *New Faculty*, https://www.regent.edu/employment/new-faculty/#required-documentation (last visited Oct. 27, 2026); *see also* REGENT UNIV., *Vision and Mission: Statement of Faith*,

requires its employees to reaffirm its statement of faith annually, including such tenets as Jesus Christ's ascension into heaven, the direct creation of Adam and Eve in God's image, the existence of the devil, and "the bodily resurrection of the just and unjust."[24] Similar mandatory statements of faith can be found at schools from many Christian denominations, including George Fox University (Quaker),[25] Fresno Pacific University (Mennonite),[26] Cedarville University (Baptist),[27] Southern Wesleyan University (Wesleyan),[28] Point University (Churches

---

https://www.regent.edu/about-regent/vision-mission/#tab-statement-of-faith (last visited Oct. 27, 2026).

[24] WHEATON COLL., *Statement of Faith and Educational Purpose*, https://www.wheaton.edu/about-wheaton/statement-of-faith-and-educational-purpose (last visited Oct. 27, 2026).

[25] GEORGE FOX UNIV., *Employee Handbook: Statement of Faith*, https://www.georgefox.edu/offices/hr/handbook/chapter05.html#5.1 (last visited Oct. 27, 2026).

[26] FRESNO PAC. UNIV., FAITH REQUIREMENTS FOR EMPLOYMENT 2 (2024), https://www.fresno.edu/sites/default/files/documents/human-resources/faith-requirements-employment-2024-09-30-accessible.pdf.

[27] CEDARVILLE UNIV., *Faculty and Staff Community Covenant*, https://www.cedarville.edu/offices/human-resources/staff-standards (last visited Oct. 27, 2026).

[28] S. WESLEYAN UNIV., *Doctrinal Statement*, https://www.swu.edu/about/employment/doctrinal-statement (last visited Oct. 27, 2026).

of Christ),[29] Olivet Nazarene University (Church of the Nazarene),[30] and Beulah Heights University (Pentecostal).[31]

### 3. Some Religious Schools Require or Encourage Formal Affiliation with a Particular Religious Organization.

Other schools require or encourage formal affiliation with a particular religious organization. Fordham University and the University of San Francisco, for example, both owe their existence to the Society of Jesus, a Catholic monastic order commonly known as the Jesuits. Both welcome faculty of all faiths, but both have mission statements inspired by Catholicism that combine concern for students' spiritual welfare with goals like "the alleviation of poverty, the promotion of justice, [and] the protection of human rights and respect for the

---

29 POINT UNIV., STATEMENT OF FAITH 1 (2025), https://point.edu/wp-content/uploads/2025/08/Point-University-Statement-of-Faith-and-Expectations_8.2025.pdf.

30 OLIVET NAZARENE UNIV., EMPLOYEE STATEMENT OF MISSION, FAITH, AND LIFESTYLE COVENANT 3 (2023), https://www.olivet.edu/wp-content/uploads/2023/08/Statement_of_Mission_Faith_and_Lifestyle.pdf.

31 BEULAH HEIGHTS UNIV., *Soul of Beulah*, https://beulah.edu/about/soul-of-beulah (last visited Oct. 27, 2026).

environment" (Fordham);[32] and "being people for others" (USF).[33] And, to preserve their Jesuit cultures, both schools have announced a preference for hiring Jesuits.[34] Under laws like the ELCRA, these schools' hiring preferences might constitute unlawful discrimination if applied to any non-ministerial role.

In short, religious schools exercise their faith through their employment decisions, including their choice of non-ministerial employees. The district court's ruling that the ELCRA poses no First Amendment problems as applied to Sacred Heart should be reversed under the church autonomy doctrine.

---

[32] FORDHAM UNIV., *Mission Statement*, https://www.fordham.edu/about/mission-statement (last visited Oct. 27, 2026).

[33] UNIV. OF S.F., *Mission Statement*, https://www.usfca.edu/who-we-are/reinventing-education/our-mission-and-values (last visited Oct. 27, 2026).

[34] *See* UNIV. OF S.F., COLLECTIVE BARGAINING AGREEMENT art. XVI (2016), https://myusf.usfca.edu/sites/default/files/documents/HR/OGC/USFFACBA.2016-2024_1.pdf; FORDHAM UNIV., *Recruitment of Jesuits to the Faculty*, https://bulletin.fordham.edu/undergraduate/academic-policies-procedures/university-policies/recruitment-of-jesuits-to-faculty (last visited Oct. 27, 2026).

## II. Michigan Law Is Neither Neutral nor Generally Applicable and Cannot Satisfy Strict Scrutiny as Applied to Sacred Heart.

Other First Amendment grounds likewise require reversal. Specifically, the ELCRA violates the First Amendment because it is not neutral or generally applicable and does not satisfy strict scrutiny.

### A. The ELCRA Is Neither Neutral nor Generally Applicable and Therefore Must Meet Strict Scrutiny under *Fulton*.

When a law is not neutral toward religion or generally applicable, it is subject to strict scrutiny under the Free Exercise Clause—meaning the government must show that the law is narrowly tailored to fulfill a compelling interest through the least restrictive means. *See Fulton*, 593 U.S. at 533.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* And although "the minimum requirement of neutrality is that a law not discriminate on its face," controlling Supreme Court precedent establishes that "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–534 (1993). That is because

"[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* at 534.

The standard governing general applicability is no less clear. "A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (citation modified). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

Measured by these standards, the ELCRA is neither neutral nor generally applicable, for at least two reasons.

*First*, the law invites government officials to consider the particular reasons for an employer's conduct by providing a mechanism for individualized exemptions. The ELCRA makes it unlawful to "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment … because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, or marital status." MICH. COMP. LAWS § 37.2202(1)(a). But the law also creates a process through which

employers may obtain individualized exemptions for “bona fide occupational qualification[s]” (BFOQs). *Id.* § 37.2208. Under that process, an employer may apply to the Michigan Civil Rights Commission “for an exemption” on the ground that “religion, national origin, age, height, weight, or sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise.” *Id.* “Upon sufficient showing, the commission may” then “grant an exemption.” *Id.*[35]

When it comes to religious schools, Michigan has consistently limited BFOQ exemptions to positions “directly involved in academic teaching … or policy decisions.” Pls.’ Mot. for Summ. J., App. pt. 3, R. 88-4, Page ID # 2608. It has refused exemptions for support staff, janitors, maintenance personnel, facilities supervisors, and other non-ministerial

---

[35] Although the BFOQ provision does not include sexual orientation and gender identity on the list of potential BFOQs, it does include “sex.” MICH. COMP. LAWS § 37.2208. The Michigan Supreme Court—adopting the U.S. Supreme Court’s reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020)—has held that “discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of the ELCRA.” *Rouch World, LLC v. Dep’t of C.R.*, 987 N.W.2d 501, 513 (Mich. 2022). Under this reasoning, the BFOQ provision presumably would extend to sexual orientation and gender identity as well. *See Bostock*, 590 U.S. at 683 (holding that discrimination based on transgender status also constitutes sex discrimination).

employees. *See id.* pt. 1, R. 88-2, Page ID # 2367–68; *id.* pt. 3, R. 88-4, Page ID # 2608.

By inviting the Commission to consider whether restricting employment based on a protected characteristic is "reasonably necessary to the normal operation" of the employer's enterprise, the BFOQ provision "permit[s] the government to grant exemptions based on the circumstances underlying each application." *Fulton*, 593 U.S. at 534. And by providing that upon sufficient showing the Commission "*may*" grant an exemption, MICH. COMP. LAWS § 37.2208 (emphasis added), it also makes the exemption process "entirely discretionary," *Fulton*, 593 U.S. at 536. That renders the ELCRA "not generally applicable." *Id.* at 533.

The BFOQ provision also raises serious problems under the church autonomy doctrine. For a court to decide what employee characteristics are "reasonably necessary to the normal operation" of a religious organization, MICH. COMP. LAWS § 37.2208, intrudes into both "church government" *and* "faith and doctrine," *Our Lady of Guadalupe*, 591 U.S. at 737. It intrudes into church government because it purports to tell religious entities what characteristics, such as religious affiliation, are important to the organization's success and functioning. And it intrudes

into faith and doctrine because determinations that certain employee characteristics are necessary to the organization's success frequently *are* matters of faith and doctrine. An organization whose central mission is to spread the gospel of Jesus Christ, for example, may believe as a matter of faith and doctrine that only those committed to the gospel of Jesus Christ may effectively further that mission. It may also believe that faithful adherence to religious conduct standards is necessary for employees to have the spiritual guidance they need to fulfill their responsibilities.

Courts also lack competence to decide what employee characteristics are "reasonably necessary" to a religious organization's "normal operation," MICH. COMP. LAWS § 37.2208, in the first place. To decide what constitutes "normal operation" would require a secular court to define what a religious organization's mission entails and what it means for the organization to effectively pursue that mission. And to decide what employee characteristics are "reasonably necessary" to that mission would call upon a secular court to pass judgment on what is and isn't important to a religious organization's pursuit of its religious ends. Courts lack competence to decide such "ecclesiastical questions." *Watson*

*v. Jones*, 80 U.S. (13 Wall.) 679, 710 (1872); *see also Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring) (warning that judicial inquiry into what a "church really believes, and how important that belief is to the church's overall mission" would "dangerously undermine the religious autonomy" of religious institutions).

*Second*, the ELCRA "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. As mentioned, the ELCRA prohibits employment discrimination on various grounds, including religion, sex, sexual orientation, and gender identity. MICH. COMP. LAWS § 37.2202(1)(a). It also prohibits schools from discriminating on the same grounds in admissions decisions and educational programs or services, with a narrow exception for religious schools that allows them to favor students who are co-religionists. *Id.* §§ 37.2402(a)–(b), 37.2403. The law further forbids places of public accommodation—which "arguably" includes Sacred Heart, *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 845 (6th Cir. 2024)—from discriminating on the same protected grounds in the provision of goods, services, and facilities, MICH. COMP. LAWS § 37.2302(a).

At the same time, however, the ELCRA contains numerous statutory exceptions from its prohibitions on religious discrimination and sex discrimination (which under Michigan law encompasses discrimination based on sexual orientation, *see Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 513 (Mich. 2022)). Dining clubs, for example—which the Act specifically defines as places of public accommodation—may limit membership to individuals of a particular religion if the purpose of the restriction is to further the teachings or principles of the religion. MICH. COMP. LAWS § 37.2301(a)(iv). Private schools may limit admission to students of only one sex. *Id.* § 37.2404.[36] Private sports leagues likewise may limit participation to minor athletes of only one sex. *Id.* § 37.2302a(4). And the prohibition on employment discrimination does not apply *at all* with respect to the employment of close family members. *See id.* § 37.2202(3) ("This section does not apply

[36] As mentioned, the ELCRA contains an exemption that allows religious schools to "limit[] admission or give[] preference to applicant[s] of the same religion." MICH. COMP. LAWS § 37.2403. However, if that religious exemption applies, the school may not take advantage of the separate single-sex exemption to the statutory prohibition on sex discrimination. *See id.* § 37.2404.

to the employment of an individual by the individual's parent, spouse, or child.").

The ELCRA thus prohibits religious conduct—applying religious criteria to the selection of employees for non-ministerial positions—while at the same time permitting other nonreligious conduct that undermines the government's asserted interests in eradicating discrimination. If the district court's ruling stands, religious schools may not limit hiring for non-ministerial positions to co-religionists, but dining clubs may limit their members to only one religion. Under the district court's reasoning, religious schools may not engage in "sex" discrimination (as defined under Michigan law) by declining to hire individuals in same-sex relationships, even where such conduct is incompatible with the schools' religious doctrine. But, under Michigan law, *all* private nonreligious schools presumably may engage in sex discrimination by admitting students of only one sex (including those of a particular sexual orientation).[37] Further, *all* private sports leagues may engage in sex discrimination by restricting participation to minor athletes of only one

[37] As noted above, Michigan courts have interpreted the term "sex" under the ELCRA to include sexual orientation and gender identity.

sex. And when it comes to employment in particular, a person who employs a close family member may discriminate against that family member on *any* protected ground.

These and "other forms of underinclusiveness" in the ELCRA demonstrate that the law's prohibitions on religious, sex, and other forms of discrimination are "not generally applicable." *Fulton*, 593 U.S. at 534. Unless the ELCRA survives strict scrutiny, it violates the Free Exercise Clause as applied to Sacred Heart.

### B. The ELCRA Violates *Tandon*'s Most-Favored-Nation Principle.

The ELCRA also is not neutral or generally applicable as applied to Sacred Heart under the standard set forth in *Tandon*, which established a parallel framework for resolving free exercise claims. In *Tandon*, claimants challenged a COVID-era California statewide executive order restricting the number of people from different households that could gather for in-home religious worship. *See* 593 U.S. at 63–64. The Supreme Court held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity

more favorably than religious exercise." *Id.* at 62. That is the situation here.

As explained, the ELCRA prohibits Sacred Heart from selecting non-ministerial employees in harmony with its religious beliefs. But it allows dining clubs to limit membership to individuals who share a common set of religious beliefs, permits private single-sex schools and private sports leagues to engage in the same sort of sex discrimination in admissions that it places off-limits to Sacred Heart in employment, and —perhaps most telling—allows individuals employing close family members to make the exact same employment decisions that are forbidden to Sacred Heart. *See* MICH. COMP. LAWS § 37.2202(3). In each of these ways, the statute "treats some comparable secular activities more favorably" than Sacred Heart's religious exercise. *Tandon*, 593 U.S. at 63.[38] This disparate treatment "trigger[s] strict scrutiny under the Free Exercise Clause." *Id.* at 62.

---

[38] That there may be good reasons to exempt employment of close family members from the statute's reach doesn't mean adverse employment decisions in that setting aren't "comparable" to adverse employment decisions in other settings, such as religious employment. *Tandon*, 593 U.S. at 63. A family member who engages in an adverse employment action based on a protected characteristic still engages in an adverse employment action based on a protected characteristic.

### C. Michigan Cannot Satisfy Strict Scrutiny as Applied to Sacred Heart.

The ELCRA "can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (citation modified). That test demands more than compiling government interests pitched "at a high level of generality." *Id.* Rather than accepting "broadly formulated interests justifying the general applicability of government mandates," the compelling interest test "scrutinize[s] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). Properly applied, strict scrutiny asks "not whether the [state] has a compelling interest in enforcing its non-discrimination policies generally, but *whether it has such an interest in denying an exception to* [*Sacred Heart*]." *Fulton*, 593 U.S. at 541 (emphasis added). As for narrow tailoring, the government must demonstrate that "so long as [it] can achieve its interests in a manner that does not burden religion, it must do so." *Id.*

Michigan cannot meet that burden. It asserts that its ban on employment discrimination serves the compelling interests of advancing equality and preventing discrimination. But that interest, stated "at a

high level of generality," falls short of the "more precise analysis" required by the First Amendment. *Id.* And Michigan's maintenance of a complete exemption for employment of close family members, along with its exemptions for dinner clubs, single-sex schools, and private sports leagues, "undermines [its] contention that its non-discrimination policies can brook no departures." *Id.* at 542. The state "offers no compelling reason why it has a particular interest in denying an exception to" Sacred Heart "while making [one] available to others." *Id.*

The ELCRA also fails the narrow tailoring requirement because Michigan has made no effort to "achieve its interests in a manner that does not burden religion." *Id.* at 541. If the state can adequately achieve employment equality while accommodating employment of close family members, it is unclear why it cannot similarly accommodate religious employers whose doctrines demand certain conduct standards. Nor is it clear why the state can accommodate sex discrimination in some circumstances (limiting admission or participation to students or athletes of a particular sex) but not others (restricting employment to individuals who keep religiously grounded sexual conduct standards—which under Michigan law can also constitute sex discrimination).

Maintaining these other exemptions while omitting any statutory exemption for religious employers may reflect Michigan's legal priorities. But on that view, "narrow tailoring must refer not to the standards of Versace, but to those of Omar the tentmaker." *Hill v. Colorado*, 530 U.S. 703, 749 (2000) (Scalia, J., dissenting). The narrow tailoring "standard is not watered down; it really means what it says." *Tandon*, 593 U.S. at 65 (citation modified).

## CONCLUSION

*Amici* ask the Court to reverse the district court.

Respectfully submitted,

/s/ *Christopher A. Bates*


Steve Sandberg
David Andersen
Aaron Worthen
Brigham Young University
Office of General Counsel
109 MCDB
Provo, UT 84602
(801) 422-4636

Christopher A. Bates
Alan Hurst
Kristen Clarke
Kirton | McConkie
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600

*Counsel for Amici Curiae*


October 30, 2026

## CERTIFICATE OF COMPLIANCE

I, Christopher A. Bates, hereby certify that:

1. This brief complies with the type-volume limitation of Sixth Circuit Rule 29-2(c)(3) and Fed. R. App. P. 32(g)(1) because it contains 6,487 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);
2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font, size 14.

October 30, 2026

*/s/ Christopher A. Bates*

Christopher A. Bates
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court on October 30, 2026, using the appellate CM/ECF system, which will send notice of the filing to all registered CM/ECF users.

October 30, 2026

/s/ *Christopher A. Bates*

Christopher A. Bates
*Counsel for Amici Curiae*